UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TERRANCE P. AERTS,

        Plaintiff,

v.                                          Case No. 04-C-0978

PRUDENTIAL LIFE INS. CO. OF AMERICA,

        Defendant.

## DECISION AND ORDER

Plaintiff Terrance P. Aerts brought this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, alleging that Defendant Prudential Life Insurance Company of America wrongfully denied him long-term disability benefits. The parties have both moved for summary judgment. For the following reasons, both motions will be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**BACKGROUND**

Until October 1, 2001, Terrence Aerts worked for AstenJohnson, Inc., as a field sales/service representative. AstenJohnson is a manufacturer of paper machine clothing, specialty fabrics, filaments and drainage equipment. Its corporate offices are located in Charleston, South Carolina, but it has plants at various other locations in the United States and Canada, including Appleton, Wisconsin.[1] As a field sales/service representative, Aerts was required to visit some eighteen mills

---

[1] This information about Asten Johnson, Inc., of which the court takes judicial notice, can be found at http://www.astenjohnson.com/ajwebdb.nsf/about-frame.html?OpenPage&charset=windows-1252. *See Laborers' Pension Fund v. Blackmore Sewer Const., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002).

in Michigan and Wisconsin, involving 40,000 to 50,000 miles of driving per year. (PRU – 0239-241). Although he had no formal education after high school, Aerts had over thirty years experience in the papermaking industry. (PRU – 0239-41.) Aerts' gross earnings for 2001 exceeded $119,000. (PRU – 0016.)

As an AstenJohnson employee, Aerts was covered by a group long-term disability (LTD) plan. The plan was funded with a policy of insurance issued by Prudential. In pertinent part, the policy provided that:

> You are disabled when Prudential determines that:
>
> • You are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> • You have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

(PRU – 0562.) After an initial 24-month period of benefits, the standard for determining eligibility significantly changed from whether the employee could perform his previous job to whether he could perform "any gainful occupation." In the language of the policy,

> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

(*Id.*) The policy defined "gainful occupation" to mean "an occupation, including self employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work." (*Id.*)

The plan also limited benefits for disabilities due to mental illness or self-reported symptoms to twenty-four months during a claimant's lifetime. It defined self-reported symptoms as:

3

> the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in the ears, dizziness, numbness and loss of energy.

(PRU – 0571.) Mental illness was defined in the plan as:

> a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine.

(PRU – 0570-571.)

On or about October 1, 2001, Aerts was determined to be disabled as a result of panic attacks, anxiety and depression. These conditions prevented him from: (1) driving, (2) working at heights, and (3) working near moving machinery, each of which was required in order for Aerts to perform his job at AstenJohnson. (PRU – 0003-4.) Subsequently, in January, 2002, Aerts was diagnosed with a physical disorder – neurocardiogenic syncope, which results in dizziness and blackouts, also making it impossible for Aerts to perform his job function. (PRU – 0003-4, 0183.) After the six month elimination period, Aerts applied for and received long-term disability benefits, effective March 31, 2002. Prudential determined Aerts' benefit to be $5,950.00 per month, or 60% of his annual salary of $119,000.00. (PRU – 0097.)

At about the same time, Prudential required Aerts to obtain a vocational assessment from Prudential's outside vocational contractor, Crawford Healthcare and Management to determine if and when Aerts could return to his job and, if he could not, to ascertain if he could be "gainfully employed" within the meaning of the policy. On April 17, 2002, Aerts was evaluated by Karen A.

4

Boehm, a vocational consultant at Crawford, who concluded from her interview of Aerts and review of his medical records and family, social, educational, and vocational background that it was unlikely he would be employable in his own or any other occupation. (PRU – 0241-42.) On July 8, 2002, Ms. Boehm performed a transferable skills analysis to determine if Aerts could perform the duties of any "gainful occupation", i.e., one that could be expected to pay him 60% of his previous monthly income within 12 months of returning to work, or approximately $5,950 ($71,000 annually). Using Green Bay as the relevant labor market, Ms. Boehm concluded that Aerts did not have the potential to perform a job that pay the $71,000 per year necessary to satisfy Prudential's definition of "gainful occupation." (PRU – 0220, 0224.)

On September 18, 2002, Prudential disability consultant Susan Williams noted in Aerts' claim file that based on Ms. Boehm's evaluation, it did not appear that Aerts was gainfully employable. Ms. Williams also noted, however, that because Aerts' primary diagnosis was a panic disorder, the policy's mental illness limitation would apply and benefits would terminate after 24 months.

By letter dated August 26, 2003, Ms. Williams notified Aerts that the initial 24-month period of benefits would end on March 30, 2004, and Prudential would be conducting a thorough evaluation to determine his eligibility for benefits beyond that date. In the same letter, Ms. Williams advised Aerts that since it had determined that his disability was caused at least in part by mental, psychoneurotic or personality disorder, benefits would most likely terminate at that time. Ms. Williams also enclosed a "Supplemental Attending Physicians' Statement." (PRU – 0082.)

Shortly thereafter, Dr. Douglas Gremban, Aerts' treating physician, completed and returned the "Supplemental Attending Physicians' Statement." Dr. Gremban noted on the form that Aerts

5

was diagnosed with neurocardiogenic syncope, dizziness, mood disorder, panic disorder and major depression. Dr. Gremban stated that Aerts' condition rendered him totally disabled such that he would be unable to perform any full-time or part-time work, and that the condition was expected to last his entire life. According to Dr. Gremban, Aerts was unable to work because of dizziness, passing out, anxiety and depression, and he had no suggestions that would allow Aerts to return to even a low-stress, sedentary job. (PRU – 176-77.)

On September 7, 2003, Aerts was awarded permanent total disability benefits from the Social Security Administration (SSA). Based on the evidence in the record, an Administrative Law Judge (ALJ) determined that Aerts was unable to "engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected . . . to last for a continuous period of not less than 12 months." With respect to his physical condition, the ALJ noted:

> The claimant's neurocadiogenic syncope has been reported to cause the claimant to experience severe dizziness and near syncope with position change such as bending activities or rising from a seated to a standing position. The claimant's response on tilt table testing has been abnormal and he has been prescribed various medications in an effort to control his syncopal episodes. .... However, to date, medications prescribed in the claimant's case for neurocardiogenic syncope have been either ineffective or have caused intolerable side effects. ....

(PRU – 0133.) The ALJ also noted that Aerts was considered to be a person of advanced age, had completed only a high school education, and had no transferrable work skills. His capacity for even light work, the ALJ noted, "was reduced to low stress occupations that do not require working at heights or near dangerous machinery." (PRU – 0134.)

On January 16, 2004, Prudential requested an updated report from Aerts' cardiologist, Dr. Mohammed Jazayeri. Dr. Jazayeri confirmed his previous diagnosis of neurocardiogenic syncope

6

and listed the following restrictions: "No standing in place for more than 5 minutes. No climbing, balance related work and no reaching above shoulder level . . . No activities involving unprotected heights, being around machinery, exposure to marked changes in temperature and humidity, driving or exposure to dust, fumes, and gases." (PRU – 0167-68.) According to Dr. Jazayeri, these restrictions were imposed as a result of Aerts' neurocardiogenic syncope and were likely to continue indefinitely. Dr. Jazayeri stated that the condition could not be treated pharmacologically due to side effects of the medications and indicated that in his opinion, Aerts was unable to work as a result. (*Id.*)

Based upon Dr. Jazayeri's report, Aerts' pre-disability earnings, and the other evidence in the file, Prudential Claim Manager Eva Pitera concluded on February 20, 2004, that it was unlikely Aerts would be capable of returning to gainful employment. (PRU – 014.) However, the file was thereafter referred to Prudential's Medical Director, Dr. Albert Kowalski, for a medical review to assess the necessity of the restrictions and limitations placed on Aerts by his cardiologist. Upon his review of the medical evidence in the file, Dr. Kowalski concluded in a March 24, 2004 report that the medical evidence did not support the restrictions Dr. Jazayeri had imposed. Dr. Kowalski noted that according to Dr. Jazayeri's notes from Aerts' last office visit in August of 2003, Aerts had had only four-to-five syncopal episodes since January of 2002, or roughly one every four months. Dr. Kowalski observed that there were no records to support actual loss of consciousness or injury from falling, and the attacks did not seem to have any impact on Aerts' activities of daily living, noting he continued to drive. He also noted that the attacks described by Aerts appeared related to his anxiety and panic attacks, and that the records reflected infrequent office visits and little by way of diagnostic testing, treatments or therapies. Dr. Kowalski concluded:

7

> in my opinion, the medical records do not support sufficient severity or frequency of the syncope to prevent the claimant from performing any reasonable occupation as long as it does not require – driving or operating heavy machinery and working at unprotected heights after 3/31/04. In addition, the depression, panic attacks and anxiety are significant contributing factors to the syncope and the mental & nervous limitations of the policy may apply after 3/31/04.

(PRU – 0019.)

Also on March 24, 2004, Prudential recalculated Aerts' pre-disability earnings based upon his 2000 W-2 as $112,965.13, including $7,122.11 in commissions, instead of the $119,000 it had been using to compute his benefit. In a note to the file, Prudential Disability Consultant Lorena Ross stated that because according to the Group Policy commissions were to be excluded from earnings, Aerts' actual earnings for disability purposes was $105,804.02. Gainful employment for Aerts therefore meant a job that would pay him at least $63,482.41 within the first year (60% of $105,804.02).

On March 26, 2004, Prudential Claim Manager Thomas Virgilio performed an employability analysis using Karen Boehm's earlier reports and Dr. Kowalski's record review. Based upon his analysis, Virgilio identified six positions he believed Aerts capable of performing, along with the median hourly wages (as of 1/1/04) for the Green Bay, Wisconsin labor market, as reported by the Economic Research Institute. The positions identified by Virgilio were: Quality Control Manager, $38.52/hr.; Administrative Assistant, $16.84/hr.; Branch Office Manager, $33.04/hr.; Contracts Manager, $40.63/hr.; Production Manager, $42.33/hr.; and Production Scheduler, $20.15/hr. (PRU – 0022.)

On March 31, 2004, Prudential wrote Aerts to inform him that as of March 31, 2004, Prudential would no longer pay any LTD benefit. Prudential provided the following explanation:

8

[T]he medical records do not support a severity or frequency of syncope episodes which would prevent you from performing any reasonable occupation. Our medical department agrees that your restrictions should include no driving or operating heavy machinery and no working at unprotected heights. . . .

According to our review, your long standing depression, panic attacks and anxiety are significant contributing factors to your syncope and dizziness. Further, Dr. Jazayeri noted on August 18, 2003 that it is difficult to treat your neurogenic syncope due to your other health factors which effected [sic] your treatment, including history of anxiety, depression, hypertension and multiple medications that you are currently on. Therefore, if not for your depression, panic attacks and anxiety it is unlikely you would have significant impairment due solely to your neurocardiogenic syncope.

In conclusion, the medical records do not support sufficient severity or frequency of the syncope to prevent you from performing any reasonable occupation as long as it does not require driving or operating heavy machinery or working at unprotected heights. In addition, your depression, panic attacks and anxiety are significant contributing factors to your syncope episodes. . . .

Based upon the corrected monthly earnings amount of $105,843.02 we reviewed whether there were gainful (60% of your Monthly Earnings) occupations for which you qualified, that were within the restrictions and limitations outlined above. We conducted an employability assessment and determined that the following gainful occupations exist for which you qualify:

Quality Control Manager, Light work $38.52/HR;
Branch Office Manager, Sedentary work $33.04/HR;
Contracts Manager, Sedentary work $40.63/HR;
Production Manager, Light Work $42.33/HR; . . .

We have determined that your syncope condition is due in part to your Anxiety disorder and panic attacks in that you hyperventilate with your syncope episodes and you are not taking syncope medication because it exacerbates your psychiatric condition. As such, your syncope condition is subject to the Benefit Limitation, defined above, which is expired. As such, benefits for your syncope which is due in part to your psychiatric conditions have expired.

In addition, while we evaluated whether your syncope was subject to the Benefit Limitation, we also evaluated whether your syncope condition would preclude you from performing any gainful work. Based upon the documentation in file, even though you continue to drive the information supports that you should be restricted from driving or operating heavy machinery as well as working at unprotected

heights. However, we have identified gainful occupations for which you qualify which are within these restrictions and limitations. As such, benefits under the Benefit Limitation have been maximally paid, and you no longer satisfy the definition of Disability required by the Group Policy. Consequently, we are unable to pay any further LTD benefits and your claim has been terminated effective April 1, 2004.

(PRU – 0075-76.)

Aerts appealed the decision, and submitted opinions from a psychiatrist and two of his treating physicians that his mental conditions did not contribute to his syncope. (PRU – 0126-127, 149.) Aerts also supplied a letter he had recently received from an employment agency, which provided in pertinent part:

> I am afraid even if you find yourself well there is increased difficulty in finding any opportunity due to the scarcity of jobs, the move towards a younger workforce and your past medical history. In all likelihood you will find it extremely difficult to find gainful employment due to fact that most would look at your medical record and be very concerned as to whether or not you could safely perform the job without fainting etc. In today's environment there is great concern over liability issues.
>
> Terry, I wish had better news for you but after exploring a number of potential options I don't see any immediate or long term opportunities for you.

(PRU – 0122.)

On May 26, 2004, Prudential denied Aerts' appeal, explaining that the medical restrictions imposed for his neurocardiogenic syncope did not prevent him from performing sedentary work and the fact that he was unable to find such work did not mean he was incapable of performing it. Prudential repeated its determination that there existed sedentary jobs in the Green Bay economy that met the earnings requirements, namely, branch office manager and contracts manager, and thus, he was not eligible for benefits beyond the initial twenty-four month period. (PRU – 0066-67.) Aerts requested reconsideration. On July 27, 2004, Aerts was informed of Prudential's denial of

10

his request for reconsideration for essentially the same reasons. (PRU – 0062-63.) In response, Aerts commenced this action.

**ANALYSIS**

The Supreme Court established in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), that judicial review of an ERISA plan administrator's decision to deny benefits is *de novo*, unless the plan itself vests the administrator with discretion. *Id.* at 115. If the plan vests the administrator with discretion, judicial review is under a deferential, or "arbitrary and capricious," standard, and the reviewing court is limited, absent unusual circumstances, to the administrative record. *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 982 (7th Cir. 1999). Otherwise, judicial review is *de novo*, which means that the court looks anew at the decision and is not bound by the administrative record. *Id.* When review is *de novo*, the court takes a fresh look at both the administrator's interpretation of the plan and the administrator's factual determinations. *Ramsey v. Hercules, Inc.*, 77 F.3d 199, 204 (7th Cir. 1996); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1098-99 & n. 4 (7th Cir.1994). And where the record before the administrator is inconclusive as to either, the parties are free to present additional evidence. *Forste v. Paul Revere Life and Accident Ins. Co.*, 2004 WL 3315386, at * 10 (S.D. Ind.2004).

Prudential argues that the plan here vests it with discretion by virtue of language providing that a beneficiary is disabled when "Prudential determines" that he meets certain criteria, and permitting Prudential to "request . . . proof of continuing disability, satisfactory to Prudential." (PRU – 0562, 0575.) The Seventh Circuit, confronted with the same language, rejected this argument in *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 638-40 (7th Cir. 2005), and held

11

that the plan failed to convey to the participants the fact that the administrator's determinations under the plan were final unless found to be arbitrary and capricious. On that basis, the *Diaz* Court reversed the district court's summary judgment in favor of the plan and remanded the case for *de novo* review. This court is bound by *Diaz* and thus must review Prudential's determination *de novo*.

Prudential's argument that it is entitled to summary judgment is based primarily on its contention that this court's review is deferential and the determination that Aerts is not disabled can only be overturned if arbitrary and capricious. Although that contention is no longer tenable in light of *Diaz*, Prudential also contends that even under a *de novo* review, its decision should be sustained. Essentially, Prudential argues that plaintiff's medical evidence did not support his claimed limitations and that the record establishes that he is capable of performing a "gainful occupation" as that term is defined in the policy. Prudential also argues that Aerts' disability is at least in part due to his anxiety, panic attacks and depression, or is based on self-reported symptoms, and would therefore be excluded under the plan's mental health and self-reported symptoms limitations. Prudential also claims that the record demonstrates Aerts was not under "the regular care of a Doctor," an essential prerequisite to a finding of disability.

Upon review of the record, the court is not convinced that Prudential has made a prima facie showing sufficient to support its motion for summary judgment. The record does not support Prudential's determination that Aerts is able to perform the duties of a "gainful occupation" for which he is reasonably fitted by education, training or experience. Recall that "gainful occupation" is defined as "an occupation, including self employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work." In order to determine whether Prudential has shown Aerts is capable of performing

12

the duties of a "gainful occupation," it is first necessary to determine what his monthly earnings were. "Monthly earnings" is defined in the policy to mean:

> your gross monthly income from your Employer in effect just prior to your date of disability. This is calculated from the W-2 form which you received from your Employer for the calendar year prior to your date of disability. If you did not receive a W-2 from your Employer, monthly earnings will be calculated from your current annualized base.

(PRU – 0550.) [2]

Here, the record shows that Aerts' earnings for calendar year 2001, the year he became disabled, were $119,828.87. (PRU – 0016.) His W-2 for the year 2000, however, showed earnings of $112,969. Based on the policy language that states monthly income is calculated from the W-2 received from the employer for the year prior to the date of disability, Prudential argues that Aerts' gainful occupation earnings amount is sixty percent of $112,969, as opposed to sixty percent of $119,828.

On this issue, the court finds that Aerts has the better argument. The clear and unambiguous language of the policy is that monthly earnings means the "gross monthly income from your Employer in effect just prior to your date of disability." While the previous year's W-2 may be used to calculate the amount of his monthly earnings, it cannot be the sole basis for calculating monthly earnings just prior to the date of disability where, as here, the employee has apparently received a substantial increase in his income. The record shows that Aerts' annual income from his employer for the year he became disabled was $119,828. This is the amount that should be used to determine whether an occupation he would be capable of performing would be considered "gainful" within

---

[2] Although Prudential argues that "monthly earnings" does not include commissions and bonuses, this is based on an earlier version of the policy (PRU – 0564) that was changed by the above-quoted rider.

13

the meaning of the policy. In other words, for Aerts to be considered no longer disabled, he would have to have retained the capacity to perform the duties of an occupation for which he was reasonably suited by education, training or experience that would pay at least $5,991 per month ($119,828/12 x .6) within the first year of his return to work.

In support of its conclusion that Aerts retains such a capacity, Prudential points to its internal vocational assessment in which it identified at least one sedentary occupation within the Green Bay labor market which, according to the Economic Research Institute, paid a median hourly wage that would meet the Aerts' income requirements for gainful employment. Aerts challenges Prudential's reliance on its vocational assessment on several grounds. He first contends that Prudential erred in determining that he was able to perform the duties of any gainful occupation because it failed to identify the "relevant labor market." (Br. at 30.) Specifically, Aerts complains that Prudential considered his employability in Green Bay, Wisconsin (where Aerts receives medical treatment) rather than Lakewood, Wisconsin (where Aerts lives). Aerts notes that the commute between Lakewood and Green Bay is approximately eighty miles and that he cannot drive because of his medical condition.

The plan, however, contains no reference to a local labor market. *Cf. Pralutsky v. Met. Life Ins. Co.*, 316 F. Supp. 2d 840, 845 (D. Minn. 2004) (defining "disability" after 24 months as being "unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings"). Given that the parties could have included such a reference had they wanted to, the court declines to supply the phrase. *See Rothe v. Revco D.S., Inc.*, 148 F.3d 672 (7th Cir. 1998) ("[P]arties to a contract have the right to define their

14

mutual rights and obligations, and a court may not make a new contract or supply omitted terms while professing to construe the contract.") It is also noteworthy that Green Bay falls within the much larger territory within which Aerts previously performed his duties for AstenJohnson. Were the court to accept his interpretation of the plan, even the availability of gainful employment with his former employer would not prevent a finding of disability. This would be an unreasonable reading of the policy.

Aerts also argues that, while Prudential determined that he "qualif[ied]" for certain occupations in the Green Bay labor market with a theoretical income exceeding 60% of his pre-disability earnings, it did not determine that he could actually find a job in any of those occupations that paid him the requisite amount. Aerts notes that an employment agency stated that it "d[id]n't see any immediate or long term opportunities" for Aerts and that he would "find it extremely difficult to find gainful employment." The plan, however, defines as disabled only those who are "unable to perform the duties of any gainful occupation," not those who are unable to secure any gainful occupation. Thus, the fact that Aerts could not, in fact, find a job does not make him disabled.

As Aerts also points out, however, the more significant problem with Prudential's determination that he retained the capacity to perform a gainful occupation is that it was based on the median wage the identified positions paid, which says nothing about whether such a position would be expected to pay such a wage within one year as the policy requires. (Pl.'s Br. in Resp. at 2.) Also missing from Prudential's analysis is any consideration of whether Aerts was reasonably suited by education, training or experience to perform the duties of any of the occupations it identified. Remember, Aerts has only a high school education and his experience is all within the

15

papermaking industry. Prudential's own outside vocational consultant concluded that Aerts' earning capacity was significantly less than required for a "gainful occupation."

Prudential has also attempted to defend its determination that Aerts is no longer entitled to long-term disability benefits on the grounds his symptoms are at least in part due to his anxiety, panic attacks and depression or that his claim is based on self-reported symptoms, and would therefore be excluded under the plan's mental health and self-reported symptoms limitations. Prudential also claims that the record demonstrates Aerts was not under the regular care of a doctor, an essential prerequisite to a finding of disability. As Aerts points out, however, the "regular care of a doctor" requirement and the "self-reported symptoms" limitation were never asserted by Prudential as reasons for terminating his disability benefits and it is questionable whether they can be asserted now. *See Harbor Insurance Company v. Continental Bank Corporation*, 922 F.2d 357, 362-63 (7th Cir. 1990); s*ee also Railway Co. v. McCarthy*, 96 U.S. 258, 267-68 (1877) ("[W]here a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold."). And although Prudential initially asserted the mental health limitation, Aerts presented evidence from his doctors which placed in dispute the suggestion that his neurocardiogenic syncope was affected by his mental conditions and Prudential did not rely upon that justification for its ultimate determination that Aerts was no longer disabled. In any event, the record is insufficient to permit a determination that Aerts is no longer disabled on any of these grounds. Accordingly, Prudential's motion will be denied.

Aerts likewise falls short of establishing a prima facie case for summary judgment in his favor. It is his burden to prove that he is disabled within the meaning of the policy. As the record

16

now stands, it is clear that Prudential disputes both the extent of his disability due to neurocardiogenic syncope and his residual earning capacity. Dr. Kowalski's opinion that the medical records submitted by Aerts do not support the severity or frequency of syncope sufficient to prevent him from performing any occupation as long as it does not involve driving, operating heavy machinery or working at unprotected heights, and his opinion that Aerts' mental health problems are significant contributors to his syncope reveal a factual dispute concerning Aerts' condition that cannot be resolved on summary judgment. More importantly, Aerts has offered no evidence to support his claim that he is unable to perform any gainful occupation within the meaning of the policy. He has offered no vocational evidence at all and the record evidence for the reasons stated above is inconclusive. Under these circumstances, summary judgment in favor of Aerts must be denied as well.

## CONCLUSION

For the foregoing reasons, the parties' cross motions for summary judgment are **DENIED.** The clerk shall set this matter on the calendar for a Rule 16 telephone conference.

**SO ORDERED.**

Dated this   28th   day of November, 2005.

s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge